**Harold R.A. WOODS, Plaintiff–Appellee,**

v.

**RONDOUT VALLEY CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION, Defendant–Appellant,**

William Cafiero, Principal of Rondout Valley Central High School, Trudi Melamed–Turck, Assistant Principal of Rondout Valley Central High School, and Marilyn Pirkle, Superintendent of Rondout Valley Central School District, sued in their individual capacities, Defendants.

Docket No. 05–1080–CV.

United States Court of Appeals, Second Circuit.

Argued: Jan. 5, 2006.

Decided: Oct. 10, 2006.

Mark C. Rushfield, Shaw and Perelson, LLP, Highland, NY, for Defendants–Appellants.

Stephen Bergstein, Thornton, Bergstein & Ullrich, LLP, Chester, NY, for Plaintiff–Appellee.

Before: FEINBERG, KEARSE, and RAGGI, Circuit Judges.

RAGGI, Circuit Judge:

On this appeal, we consider whether defendant Rondout Valley Central School District Board of Education is an arm of the State of New York entitled to claim Eleventh Amendment immunity. We conclude that it is not.

## I. *Factual Background*

The background facts that follow are taken from the complaint. Plaintiff Harold Woods was first employed as a *per diem* substitute teacher at Rondout Valley Central High School in September 1999, two months shy of his sixty-ninth birthday. A few years later, in April 2003, Woods published what he describes as "a fact-based and informative article on sexual harassment" in a periodical distributed to members of the Rondout Valley Federation of Teachers. Compl. ¶ 37. The publication of this article apparently coincided with a school district investigation into claims by employees of sexual harassment by defendant William Cafiero, the principal of Rondout Valley Central High School. That investigation ultimately resulted in Cafiero's two-week suspension during the summer of 2003.

Woods asserts that the following fall, on or about November 18, 2003, Cafiero and the high school's assistant principal, defendant Trudi Melamed–Turck, told Woods that, because he was "stressed out," he would be reassigned to one of the district's elementary schools. *Id.* ¶¶ 14–15. Instead, on December 8, 2003, Woods received a letter from defendant Marilyn Pirkle, the Superintendent of the Rondout Valley Central School District, notifying him that he was terminated.

In a complaint filed in the Northern District of New York on June 17, 2004, and entered on June 22, 2004, Woods charged Cafiero, Melamed–Turck, and Pirkle, as well as the Rondout Valley Central School District Board of Education (the "Board of Education" or the "Board") with unlawful dismissal based on age and in retaliation

for his having engaged in protected speech. He sought legal and equitable relief against all defendants pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA"), *see* 29 U.S.C. §§ 621–634, the New York Human Rights Law, *see* N.Y. Exec. Law § 296 et seq. and 42 U.S.C. § 1983. The defendants moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6), arguing that Cafiero, Melamed–Turck, and Pirkle could not be held individually liable under the ADEA, and that the Board of Education, as an arm of the State of New York, was immune from suit under the Eleventh Amendment. The district court (Lawrence E. Kahn, *Judge)* agreed with the former argument and dismissed the ADEA claim against the individual defendants, but it rejected the Board's Eleventh Amendment claim, relying on this court's decisions in *Fay v. South Colonie Central School District*, 802 F.2d 21, 27–28 (2d Cir.1986) (rejecting school district claim of Eleventh Amendment immunity), *overruled on other grounds by Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 786 (2d Cir. 2002),[1] and *Mancuso v. New York State Thruway Authority*, 86 F.3d 289, 291 (2d Cir.1996). *See Woods v. Cafiero*, No. 04–0695, 2005 WL 3871601, at *1–2, *5, 2005 U.S. Dist. LEXIS 5780, at *4–5, *15–16 (N.D.N.Y. Feb. 7, 2005). The Board sought interlocutory review of the district court's Eleventh Amendment ruling.[2]

## II. *Discussion*

### A. *Jurisdiction and Standard of Review*

■ In general, this court's appellate jurisdiction is confined to final judgments.

*See* 28 U.S.C. § 1291. Because the denial of a motion to dismiss is not a final judgment, it is "not immediately appealable unless it satisfies the 'collateral order' exception articulated in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 545–46, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)." *Bernard v. County of Suffolk*, 356 F.3d 495, 501 (2d Cir.2004); *see Mancuso v. New York State Thruway Auth.*, 86 F.3d at 291. Under the collateral order doctrine, a non-final order is appealable only if it conclusively determines the disputed question, resolves an important issue completely separate from the merits of the action, and is effectively unreviewable on appeal from a final judgment. *See Will v. Hallock*, —— U.S. ——, ——, 126 S.Ct. 952, 957, 163 L.Ed.2d 836 (2006). The Supreme Court has held that orders rejecting Eleventh Amendment immunity claims fall squarely within the collateral order exception: " 'States and state entities that claim to be "arms of the state" may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity.' " *Tennessee v. Lane*, 541 U.S. 509, 514 n. 1, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (quoting *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993)). Accordingly, because the Board claims to be an arm of the State of New York, we have jurisdiction to consider its appeal from the district court's denial of its motion to dismiss on the ground of Eleventh Amendment immunity.

We review *de novo* a district court's denial of a motion to dismiss. *See Toussie v. Powell*, 323 F.3d 178, 181 (2d Cir.2003).

---

**1.** *Fay* was overruled on the issue of whether the record access provisions in the Family Educational Rights and Privacy Act created a personal right enforceable under 42 U.S.C. § 1983. *See Taylor v. Vt. Dep't of Educ.*, 313 F.3d at 786. *Fay* held that they did; *Taylor* concluded that they did not. This point is irrelevant to our resolution of this appeal.

**2.** Because the district court's dismissal of Woods's ADEA claims against the individual defendants is not the subject of this appeal, we do not here review that decision.

B. *Eleventh Amendment Immunity Does Not Extend to the Defendant Board of Education*

1. *Eleventh Amendment Immunity*

■ The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const., amend. XI. The Amendment is " 'rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity,' " *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 39, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994) (quoting *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. at 146, 113 S.Ct. 684), and " 'it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without [the sovereign's] consent,' " *Seminole Tribe v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (quoting *Hans v. Louisiana*, 134 U.S. 1, 13, 10 S.Ct. 504, 33 L.Ed. 842 (1890)) (emphasis removed). Although the Amendment, by its terms, bars only federal suits against state governments by citizens of another state or foreign country, it has been interpreted also to bar federal suits against state governments by a state's own citizens, *see Hans v. Louisiana*, 134 U.S. at 15, 10 S.Ct. 504, as well as state court actions against state governments, *see Alden v. Maine*, 527 U.S. 706, 712, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). While Congress may abrogate the states' Eleventh Amendment immunity when acting pursuant to its authority under Section 5 of the Fourteenth Amendment, *see* U.S. Const., amend. XIV, § 5; *Tennessee v. Lane*, 541 U.S. at 518, 124 S.Ct. 1978, as a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, *see Lapides v. Bd. of Regents*, 535 U.S. 613, 618–19, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

■ The immunity recognized by the Eleventh Amendment extends beyond the states themselves to "state agents and state instrumentalities" that are, effectively, arms of a state. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997); *see also McGinty v. New York*, 251 F.3d 84, 95 (2d Cir.2001). It does not, however, extend to "suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the State." *Alden v. Maine*, 527 U.S. at 756, 119 S.Ct. 2240; *see also Board of Trustees v. Garrett*, 531 U.S. 356, 369, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). Thus, as this court has explained, a governmental entity is entitled to Eleventh Amendment immunity only if " 'it is more like an arm of the State,' such as a state agency, than like 'a municipal corporation or other political subdivision.' " *Mancuso v. New York State Thruway Auth.*, 86 F.3d at 292 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

■ In determining whether a putative state entity is, in fact, an arm of the state, courts look to "the relationship between the State and the entity in question." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. at 429, 117 S.Ct. 900. This inquiry has sometimes focused on the " 'essential nature and effect of the proceeding,' " *id.* (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945)), and, at other times, has looked to the " 'nature of the entity created by state law,' " *id.* (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. at 280, 97 S.Ct. 568). Be-

cause the Supreme Court has instructed that the latter inquiry is appropriate when the named defendant is a board of education, *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. at 280, 97 S.Ct. 568, our Eleventh Amendment inquiry in this case looks to those provisions of New York State law that define the Board's character. Notwithstanding our necessary reference to state law, the ultimate question whether a particular governmental entity is an arm of the state for Eleventh Amendment purposes is one of federal law. *See Regents of the Univ. of Cal. v. Doe,* 519 U.S. at 429, 117 S.Ct. 900 n. 5.

### 2. The Burden of Proving Entitlement to Eleventh Amendment Immunity

■ This court has not previously addressed the issue of which party bears the burden when a governmental entity claims that it is an arm of the state entitled to Eleventh Amendment immunity. To the extent the Eleventh Amendment is construed as a specific limitation on the Article III powers of the federal courts that deprives them of subject matter jurisdiction to hear claims against the states, the burden might appear to fall on Woods because it is generally a plaintiff's burden to demonstrate subject matter jurisdiction. *See, e.g., Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir.2005). To the extent, however, that Eleventh Amendment immunity is viewed as akin to an affirmative defense that a state may assert or waive at its discretion, the burden would appear to fall on the defendant Board of Education. *See, e.g., Drexel Burnham Lambert Group, Inc. v. Galadari,* 777 F.2d 877, 880 (2d Cir.1985) ("The party asserting an affirmative defense usually has the burden of proving it.").

Although the Supreme Court has not specifically ruled on this burden question,

circuit courts that have done so have unanimously concluded that "the entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity." *Gragg v. Ky. Cabinet for Workforce Dev.,* 289 F.3d 958, 963 (6th Cir.2002); *see Skelton v. Camp,* 234 F.3d 292, 297 (5th Cir.2000) (noting that the state entity "bear[s] the burden of proof in demonstrating that [it] is an arm of the state entitled to Eleventh Amendment immunity"); *Christy v. Pa. Turnpike Comm'n,* 54 F.3d 1140, 1144 (3d Cir.1995) (concluding that "the party asserting Eleventh Amendment immunity bears the burden of proving entitlement to it"); *Baxter v. Vigo County Sch. Corp.,* 26 F.3d 728, 734 n. 5 (7th Cir.1994) (observing that "[e]ven if we were to reach the merits of this Eleventh Amendment assertion, we would have to conclude that the [state entity] has not begun to meet its burden of persuasion"), superseded in other part by statute, *see* Ind.Code § 12–19–1–21; *ITSI TV Prods., Inc. v. Agricultural Ass'ns,* 3 F.3d 1289, 1292 (9th Cir.1993) (noting that "the public entity ought to bear the burden of proving the facts that establish its immunity under the Eleventh Amendment"). We now join these sister courts in holding that the governmental entity invoking the Eleventh Amendment bears the burden of demonstrating that it qualifies as an arm of the state entitled to share in its immunity.

In reaching this conclusion, we preliminarily acknowledge that the Supreme Court has, on more than one occasion, described the Eleventh Amendment as a "jurisdictional bar," *Seminole Tribe v. Florida,* 517 U.S. at 73, 116 S.Ct. 1114; *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), and has stated that "the principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III," *Pennhurst*

*State Sch. & Hosp. v. Halderman,* 465 U.S. at 98, 104 S.Ct. 900. Further, the Court has held that Eleventh Amendment immunity, like subject matter jurisdiction, is an issue that may be raised for the first time on appeal. *See Edelman v. Jordan,* 415 U.S. 651, 677–78, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

Nevertheless, the Court has also expressly declared that the question whether "Eleventh Amendment immunity is a matter of subject matter jurisdiction" is one that "we have not decided." *Wisconsin Dep't of Corr. v. Schacht,* 524 U.S. 381, 391, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998). Certain language in *Schacht,* in fact, supports analogizing a sovereign immunity claim to an affirmative defense, which a party may invoke or not as it wishes: "[T]he Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so." *Id.* at 389, 122 S.Ct. 877. Such an analogy derives further support from two notable deviations from core jurisdictional principles in the Supreme Court's Eleventh Amendment jurisprudence. First, the Court has held that states may waive Eleventh Amendment immunity, *see, e.g., Lapides v. Bd. of Regents,* 535 U.S. at 618, 122 S.Ct. 1640, a position inconsistent with the idea that the Amendment deprives federal courts of subject matter jurisdiction. The law is well established that a party's consent cannot by itself confer subject matter jurisdiction upon a court. *See Wisconsin Dep't of Corr. v. Schacht,* 524 U.S. at 389, 118 S.Ct. 2047; *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinée,* 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). Second, the Court has held that, although lower courts may raise the issue of Eleventh Amendment immunity sua sponte, they are not required to do so, *see Wisconsin Dep't of Corr. v. Schacht,* 524 U.S. at 389, 118 S.Ct. 2047; *Patsy v. Bd. of*

*Regents,* 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), a position inconsistent with the principle that a court must always raise on its own motion any defect in subject matter jurisdiction, *see Wisconsin Dep't of Corr. v. Schacht,* 524 U.S. at 389, 118 S.Ct. 2047; *Mansfield, Coldwater & Lake Mich. Ry. Co. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884).

Placing the burden of proving entitlement to Eleventh Amendment immunity on the asserting governmental entity is also consistent with our procedures for evaluating immunity claims by foreign entities under the Foreign Sovereign Immunities Act. *See* 28 U.S.C. §§ 1330, 1602–1611; *Virtual Countries, Inc. v. Republic of S. Afr.,* 300 F.3d 230, 241 (2d Cir.2002) (noting that the ultimate burden of persuasion remains with the foreign entity seeking to invoke sovereign immunity); *see also ITSI TV Prods., Inc. v. Agricultural Ass'ns,* 3 F.3d at 1291–92. Further, the allocation of the burden to the governmental entity comports with the traditional principle that a party in possession of facts tending to support its claim should be required to come forward with that information. *See Drexel Burnham Lambert Group, Inc. v. Galadari,* 777 F.2d at 880 (noting that assigning burden to party asserting affirmative defense "has particular cogency where the facts in support of the defense are peculiarly within the knowledge of the party asserting it"). As the Ninth Circuit has observed, "a claim of Eleventh Amendment immunity will occasion serious dispute only where a relatively complex institutional arrangement makes it unclear whether a given entity ought to be treated as an arm of the state." *ITSI TV Prods., Inc. v. Agricultural Ass'ns,* 3 F.3d at 1292. In such cases, the facts supporting the defense will often be "peculiarly within the knowledge" of the govern-

mental entity asserting it, so that placing the burden upon that party will encourage prompt disclosure of the facts relevant to resolving the immunity claim.

For all these reasons, we conclude that it is the Board of Education that, in this case, bears the burden of demonstrating that it is an arm of the State of New York entitled to dismissal of this lawsuit on the ground of Eleventh Amendment immunity. We further conclude, for reasons detailed in the next section, that the district court correctly ruled that the Board had not carried this burden.

### 3. The Defendant Board of Education Is Not an Arm of New York State

a. *Fay v. South Colonie Central School District Does Not Conclusively Preclude the Defendant Board of Education from Asserting that It Is an Arm of the State Entitled to Eleventh Amendment Immunity*

This court has never specifically ruled as to whether a New York school district's board of education is an arm of the state entitled to Eleventh Amendment immunity from suit in federal court. In *Mt. Healthy City School District Board of Education v. Doyle,* the Supreme Court ruled that a local Ohio board of education was not entitled to such immunity because it was "more like a county or city than it [was] like an arm of the State." 429 U.S. at 280, 97 S.Ct. 568. We reached the same conclusion with respect to a local Connecticut board of education, *see Rosa R. v. Connelly,* 889 F.2d 435, 437–38 (2d Cir.1989), as have other federal courts considering immunity claims by boards of education in New Jersey, *see Febres v. Camden Bd. of Educ.,* 445 F.3d 227 (3d Cir.2006), in North Carolina, *see Cash v. Granville County Bd. of Educ.,* 242 F.3d 219 (4th Cir.2001), in New Mexico, *see Duke v. Grady Mun. Schs.,* 127 F.3d 972 (10th Cir.1997), in

Utah, *see Ambus v. Granite Bd. of Educ.,* 995 F.2d 992 (10th Cir.1993) (en banc), in Alabama, *see Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499 (11th Cir. 1990), in Louisiana, *see Minton v. St. Bernard Parish Sch. Bd.,* 803 F.2d 129 (5th Cir.1986), in Florida, *see Campbell v. Gadsden County Dist. Sch. Bd.,* 534 F.2d 650 (5th Cir.1976), in Mississippi, *see Adams v. Rankin County Bd. of Educ.,* 524 F.2d 928 (5th Cir.1975), and in Kentucky, *see Tolliver v. Harlan County Bd. of Educ.,* 887 F.Supp. 144 (E.D.Ky.1995).

With respect to New York, in *Fay v. South Colonie Central School District,* 802 F.2d 21, we concluded that local school districts were not arms of that state for purposes of claiming Eleventh Amendment immunity, a view also shared by federal courts considering similar claims by school districts in Alaska, *see Holz v. Nenana City Pub. Sch. Dist.,* 347 F.3d 1176 (9th Cir.2003), in Arizona, *see Savage v. Glendale Union High Sch. Dist. No. 205,* 343 F.3d 1036 (9th Cir.2003), in Nevada, *see Eason v. Clark County Sch. Dist.,* 303 F.3d 1137 (9th Cir.2002), in New Mexico, *see Duke v. Grady Mun. Schs.,* 127 F.3d 972 (10th Cir.1997), in Pennsylvania, *see Lester H. ex rel. Octavia P. v. Gilhool,* 916 F.2d 865 (3d Cir.1990), in Texas, *see Lopez v. Houston Indep. Sch. Dist.,* 817 F.2d 351 (5th Cir.1987), *overruled on other grounds by Walton v. Alexander,* 44 F.3d 1297 (5th Cir.1995), in Illinois, *see Gary A. v. New Trier High Sch. Dist. No. 203,* 796 F.2d 940 (7th Cir.1986), in Wyoming, *see Stoddard v. Sch. Dist. No. 1,* 590 F.2d 829 (10th Cir.1979), in Kansas, *see Unified Sch. Dist. No. 480 v. Epperson,* 583 F.2d 1118 (10th Cir.1978), in South Dakota, *see Wigg v. Sioux Falls Sch. Dist. 49–5,* 274 F.Supp.2d 1084 (D.S.D.2003), *rev'd in part on other grounds,* 382 F.3d 807 (8th Cir.2004), and in Delaware, *see Eckerd v. Indian River*

*Sch. Dist.*, 475 F.Supp. 1350 (D.Del.1979).[3]

The district court concluded that *Fay* compelled it to reject the Board of Education's assertion of Eleventh Amendment immunity in this case. That conclusion would certainly obtain if the named defendant in this case were the Rondout Valley Central *School District* but, instead, the defendant is the Rondout Valley Central School District *Board of Education.* The distinction is significant because, under New York law, these two entities enjoy separate corporate existences. *See* N.Y. Const. art. X, § 5 (identifying school districts as "public corporation[s]"); N.Y. Educ. Law § 1701 (identifying boards of education as "bod[ies] corporate"). Indeed, New York allows plaintiffs to file suit against either a school district or a board of education. *See* N.Y. Educ. Law § 3813 (stating, *inter alia,* that no action shall be commenced against a "school district" or a "board of education" more than one year after cause of action arose). Accordingly, although the defendant Board faces an uphill battle arguing that it is entitled to Eleventh Amendment immunity because its pertinent characteristics are, in many respects, similar to those of a school district, we cannot summarily affirm the district court's denial of the Board's motion to dismiss simply by citing to *Fay.*

b. *The Continued Viability of the Mancuso Test for Determining Whether a Governmental Entity Is an Arm of the State Entitled to Eleventh Amendment Immunity*

In considering the Board's appeal, we necessarily begin by referencing those factors relevant to determining whether a governmental entity is an arm of the state entitled to Eleventh Amendment immunity. In *Mancuso v. New York State Thruway Authority,* this court articulated a test that requires us initially to consider six pertinent factors: "(1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding upon the state." 86 F.3d at 293 (citing *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency,* 440 U.S. 391, 401–02, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979)); *accord McGinty v. New York,* 251 F.3d at 95–96; *see also Feeney v. Port Auth. Trans–Hudson Corp.,* 873 F.2d 628, 630–31 (2d Cir. 1989), *aff'd on other grounds,* 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990). If these factors all point in one direction, then a court's inquiry is complete. *See generally McGinty v. New York,* 251 F.3d at 100 (concluding that state entity was immune from suit after determining that all of the *Mancuso* factors "point in the same direction"). If, however, these factors point in different directions, a court focuses on the twin reasons for the Eleventh Amendment: (1) protecting the dignity of the state, and (2) preserving the state treasury. *See Mancuso v. New York State Thruway Auth.,* 86 F.3d at 293 (citing *Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. at 39–40, 47, 115 S.Ct. 394).

---

**3.** Some courts have held that, under the particular educational structure in a minority of the states, local school boards or school districts are properly viewed as arms of the sovereign entitled to Eleventh Amendment immunity. *See, e.g., Belanger v. Madera Unified Sch. Dist.,* 963 F.2d 248 (9th Cir.1992) (California); *De Levay v. Richmond County Sch. Bd.,* 284 F.2d 340 (4th Cir.1960) *(per curiam)* (Virginia); *Smith v. Sch. Dist.,* 324 F.Supp.2d 786 (D.S.C.2004) (South Carolina); *Biggs v. Bd. of Educ.,* 229 F.Supp.2d 437 (D.Md.2002) (Maryland).

If the outcome still remains in doubt, then whether a judgment against the governmental entity would be paid out of the state treasury generally determines the application of Eleventh Amendment immunity. *See Mancuso v. New York State Thruway Auth.*, 86 F.3d at 293; *accord McGinty v. New York*, 251 F.3d at 96. As *Mancuso* observed, this conclusion finds support in Supreme Court precedent emphasizing " 'the vulnerability of the State's purse [as] the most salient factor' " determining Eleventh Amendment immunity. 86 F.3d at 293 (quoting *Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. at 48, 115 S.Ct. 394); *see Regents of the Univ. of Cal. v. Doe*, 519 U.S. at 430, 117 S.Ct. 900 ("[T]he question whether a money judgment against a state instrumentality or official would be enforceable against the State is of considerable importance to any evaluation of the relationship between the State and the entity or individual being sued."); *Edelman v. Jordan*, 415 U.S. at 663, 94 S.Ct. 1347 ("[T]he rule has evolved that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment.").

The defendant Board acknowledges that the *Mancuso* test controls this appeal absent an intervening Supreme Court decision. *See Veltri v. Bldg. Serv. 32B–J Pension Fund*, 393 F.3d 318, 327 (2d Cir.2004) ("[O]ne panel of this Court cannot overrule a prior decision of another panel unless there has been an intervening Supreme Court decision that casts doubt on our controlling precedent." (internal quotation marks omitted)). Nevertheless, the Board contends that *Federal Maritime Commission (FMC) v. South Carolina State Ports Authority*, 535 U.S. 743, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002), constitutes such an intervening decision. Specifically, it submits that, in *FMC*, the Supreme Court retreated from its identification of the vul-

nerability of the state treasury as the most salient factor in determining whether a governmental entity is an arm of the state, focusing instead on the respect owed to the states as joint sovereigns: "While state sovereign immunity serves the important function of shielding state treasuries and thus preserving the States' ability to govern in accordance with the will of their citizens, the doctrine's *central purpose is to accord the States the respect owed them as joint sovereigns.*" *Id.* at 765, 122 S.Ct. 1864 (emphasis added) (internal citation and quotation marks omitted). We cannot agree with the Board that this language sounds a retreat from established precedent for determining when a putative state entity qualifies for Eleventh Amendment immunity.

Preliminarily, we observe that the Supreme Court has long identified the states' sovereign dignity as the primary concern of the Eleventh Amendment. In *In re Ayers*, 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216 (1887), a case decided more than a century before *FMC*, the Court observed that "[t]he very object and purpose of the 11th Amendment were to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties," noting that "[i]t was thought to be neither becoming nor convenient that the several States of the Union, invested with that large residuum of sovereignty which had not been delegated to the United States, should be summoned as defendants to answer the complaints of private persons." *Id.* at 505, 8 S.Ct. 164. Thus, when the Supreme Court stated in *FMC* that state sovereign immunity's "central purpose is to accord the States the respect owed them as joint sovereigns," 535 U.S. at 765, 122 S.Ct. 1864, it was merely reiterating a long-established and non-controversial principle. It was not stating a new rule of law

or casting doubt on intervening precedents such as *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245.

In any event, the issue before the Court in *FMC* was not whether the agency there at issue was, in fact, an arm of the State of South Carolina. The Court assumed that it was, as the Fourth Circuit had so ruled, and neither party argued otherwise. *See FMC v. South Carolina State Ports Auth.*, 535 U.S. at 751, 122 S.Ct. 1864 n. 6. Rather, the issue in FMC was whether Eleventh Amendment immunity could be invoked in federal agency proceedings. The Court concluded that Eleventh Amendment immunity applied in such proceedings because the dignity of a state was no less injured by compelled participation in a federal agency proceeding than by participation in a court action: "[I]f the Framers thought it an impermissible affront to a State's dignity to be required to answer the complaints of private parties in federal courts, we cannot imagine that they would have found it acceptable to compel a State to do exactly the same thing before the administrative tribunal of an agency, such as the FMC." *Id.* at 760, 122 S.Ct. 1864. This conclusion, however, hardly suggests a sea change in the Court's jurisprudence for identifying those governmental entities qualifying as arms of the state for purposes of Eleventh Amendment immunity. To the contrary, the two inquiries—(1) what entities are entitled to partake of the State's immunity, and (2) what protections are afforded the state under the Eleventh Amendment—are distinct. *See Fresenius Med. Care Cardiovascular Res., Inc. v. Puerto Rico and the Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 67 (1 st Cir.2003) (noting that whereas "Seminole and its progeny [including FMC] are addressed to what protection is given the state by the Eleventh Amendment[,] Hess is concerned with who is entitled to share that protection").

Consistent with this analysis, those courts that, after *FMC*, have considered an entity's claim to be an arm of the state have not read that decision as substantially modifying the analytic framework established by *Hess*. *See Takle v. Univ. of Wis. Hosp. and Clinics Auth.*, 402 F.3d 768, 769, 772 (7th Cir.2005) (acknowledging "cases that say that the purpose of sovereign immunity is to protect not only the state's fiscal independence but also its 'dignity' " but noting that "to say that the effect of a judgment on state finances is never important would be inconsistent with numerous decisions of the Supreme Court and the courts of appeals"); *S.J. v. Hamilton County*, 374 F.3d 416, 423 (6th Cir. 2004) (observing that values beyond guarding public fisc play role in any arm-of-the-state analysis but concluding that "[its] precedents and the Supreme Court's case law still single out the factor of responsibility for a judgment as the most important (albeit not exclusive) determinant of arm-of-the-state status"); *Fresenius Med. Care Cardiovascular Res., Inc. v. Puerto Rico and the Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d at 65–67 (1st Cir.) (concluding that first stage of arm-of-the-state analysis pays deference to state's dignitary interest but if relevant factors point in different directions, then dispositive question is whether damages will be paid from state treasury). Indeed, this court, in a decision handed down after *FMC*, has expressly stated that "the extent to which the state would be responsible for satisfying any judgment that might be entered against the defendant entity" is the "most salient factor in Eleventh Amendment determinations." *Clissuras v. City Univ. of N.Y.*, 359 F.3d 79, 82 (2d Cir.2004) (per curiam) (internal quotation marks omitted).

Accordingly, we reject the Board's argument that *FMC* requires this court to abandon the *Mancuso* test for determining when a governmental entity qualifies as an arm of the state. We reiterate: (1) if the six identified factors uniformly indicate that the governmental entity is (or is not) an arm of the state, that answer controls the Eleventh Amendment inquiry; (2) if the factors point in different directions, then a court considers whether suit against the governmental entity violates the Amendment's twin reasons for being, i.e., preserving the dignity and treasury of the state; (3) if the outcome remains in doubt even after considering the Amendment's twin reasons for being, then the determining factor is the effect any judgment against the governmental entity would have on the state treasury.

Applying these principles to this case, we conclude that the defendant Board of Education has failed convincingly to demonstrate that it is an arm of New York State entitled to dismissal of this action on the ground of Eleventh Amendment immunity.

### c. *Applying the Mancuso Test to the Board's Claim*

■ The Board of Education submits that, even under the *Mancuso* test, it qualifies as an arm of New York State entitled to Eleventh Amendment immunity. We disagree.

### (1) *The Relevant Six–Factor Inquiry*

At the first step of the *Mancuso* test, we consider the six factors relevant to determining whether the defendant Board of Education is an arm of the State of New York. We conclude that these factors do not support that claim.

### (a) *How the Entity Is Identified in Its Documents of Origin*

The first factor, how the entity is identified in its documents of origin, tilts against the Board's claim that it is an arm of the State of New York. As already discussed, Eleventh Amendment immunity does not extend to a "municipal corporation," *Alden v. Maine,* 527 U.S. at 756, 119 S.Ct. 2240, or a "political subdivision" of the state, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. at 280, 97 S.Ct. 568, or "units of local government, such as cities and counties," *Board of Trustees v. Garrett,* 531 U.S. at 368, 121 S.Ct. 955. Although New York law does not specifically identify boards of education as municipal corporations, their status as such can reasonably be inferred from the overall statutory context in which such boards originate.

New York Education Law identifies boards of education as "bod[ies] corporate," N.Y. Educ. Law § 1701,[4] whose purpose is to administer and manage the schools and educational affairs of the particular "school district" in which the board is created, *see id.* § 1709.[5] While New

---

4. Although § 1701, by its terms, references boards of education in "union free school district[s]," N.Y. Educ. Law § 1701, Section 1804 generally extends its provisions to central school districts as well, *see id.* ("Except as provided in this article, all the provisions of this chapter or of any other general law relating to or affecting union free school districts shall apply to central districts organized as herein provided.").

5. In general, the New York State Commissioner of Education is responsible for laying out a plan for the creation of any new central school district, *see* N.Y. Educ. Law § 1801(1), after which the voters in that district must give their approval for the school district, in fact, to come into existence, *see id.* §§ 1802, 1803. At the same time, or soon thereafter, the voters elect a board of education to manage the district. *See id.* § 1804(2) ("The first board of education shall be elected at the

York law does not specify the type of corporate identity assumed by a board of education, *see* N.Y. Gen. Constr. Law § 66 (defining various types of corporations that may exist under state law), the state constitution does describe a school district, the entity governed by a board of education, as a "public corporation," N.Y. Const. art. X, § 5. New York law defines "public corporation" to include "municipal corporation[s]," N.Y. Gen. Constr. Law § 66(1) and, further, defines "municipal corporation" to include a "school district," *id.* § 66(2) ("A 'municipal corporation' includes a county, city, town, village and school district."). Thus, under New York law, a board of education is the corporate body that governs the schools and educational affairs of a particular municipal corporation, i.e., a school district. In this statutory context, it is reasonable to infer that a board of education, like the district it governs, is a municipal corporation. Indeed, New York courts, with little discussion, have so characterized boards of education. *See Golden v. Clark,* 76 N.Y.2d 618, 624, 563 N.Y.S.2d 1, 4, 564 N.E.2d 611 (1990) (referring to boards of education as "municipal corporations"); *Perrenod v. Liberty Bd. of Educ.,* 223 A.D.2d 870, 870–71, 636 N.Y.S.2d 210, 212 (3d Dep't 1996) (same). Accordingly, because New York law can fairly be construed to identify boards of education, like school districts, as "municipal corporations," we conclude that the first *Mancuso* factor weighs against the Board's claim that it is an arm of the state entitled to share in its Eleventh Amendment immunity.

meeting at which the resolution organizing such central school district and establishing a central school is adopted...."). To the extent different laws and procedures apply to the selection of boards of education in New York's largest cities, *see id.* § 2590–b (discussing board selection in New York City); § 2553 (discussing board selection in Buffalo,

### (b) *How the Governing Members of the Entity Are Appointed*

Little discussion is necessary to demonstrate that the second *Mancuso* factor also weighs against the Board's immunity claim. As already detailed in footnote 5, *supra,* New York law generally provides for members of a board of education to be elected locally by voters in each school district. Board members are not selected in state-wide elections, nor are they appointed by state officials, circumstances more indicative of an entity's operation as an arm of the state. *See McGinty v. New York,* 251 F.3d at 96–97 (noting that state appointment of officials for Retirement System weighed in favor of immunity); *Mancuso v. New York State Thruway Auth.,* 86 F.3d at 295 (observing that governor's appointment of Thruway Authority members with state senate consent weighed in favor of immunity).

### (c) *How the Entity Is Funded*

The defendant Board argues that New York State's funding of the Rondout Valley Central School District, which funds are then administered and expended by the Board, compels a conclusion that this factor weighs in favor of its immunity claim. We are not persuaded.

Preliminarily, we observe that New York school districts are not funded solely by state appropriations; they are also locally funded through property taxes. *See* N.Y. Educ. Law § 1709(20) (giving board of education power to tax property in school district). In *Rosa R. v. Connelly,*

Rochester, Syracuse, and Yonkers); § 2502 (discussing board selection in other cities), we do not detail those procedures in this opinion, except to note that the member selection process even in these circumstances also remains largely with local voters or local elected officials.

889 F.2d at 438, this court ruled that Connecticut boards of education could not claim Eleventh Amendment immunity as arms of the state when local communities financed, on average, 49.8% of their educational costs and the state contributed 42.9%. The Board has pointed us to nothing indicating a different funding pattern in New York that tilts more favorably toward its immunity claim. Nor does it appear that it could do so. In *Campaign for Fiscal Equity, Inc. v. State*, 100 N.Y.2d 893, 905, 769 N.Y.S.2d 106, 110, 801 N.E.2d 326 (2003), the New York Court of Appeals observed that, in the 1996–97 school year, local communities provided 56% of all New York public school funding, the state provided 39.9%, and the federal government 4%.[6] Thus, we conclude that this funding factor weighs against the Board's claim to be an arm of the state.

We note that, even if we were to conclude otherwise, this factor alone would not entitle the Board to claim sovereign immunity. In *Fay v. South Colonie Central School District*, this court ruled that "[i]nferior government bodies," in that case a New York school district, "do not share in Eleventh Amendment immunity simply because they receive state funds." 802 F.2d at 27. No different conclusion is warranted here, where immunity is claimed by a board of education entrusted with both administering the state funds allocated to a particular school district and raising money by levying local taxes. *See generally Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. at 280–81, 97

S.Ct. 568 (rejecting immunity claim by local board of education, even though it received "a significant amount of money from the State" of Ohio, because record as a whole, which included evidence of board's ability to raise money locally by issuing bonds and levying taxes, demonstrated that board was "more like a county or city than it [was] like an arm of the State").

### (d) *Whether the Entity's Function Is Traditionally One of Local or State Government*

The Board asserts that, because New York views public education as a state rather than local function, the fourth *Mancuso* factor weighs in favor of its claim to be an arm of the state. In support of its argument, the Board emphasizes *Lanza v. Wagner*, in which the New York Court of Appeals observed that boards of education were "created by the State for the purpose of carrying out a purely State function," specifically "the administration of public education," which should "be kept separate and apart from all other local or municipal functions." 11 N.Y.2d 317, 326, 229 N.Y.S.2d 380, 386–87, 183 N.E.2d 670 (1962); *see also id.* (identifying board of education "as an agency of State Government"[7]). Similar language appears in a number of cases dealing with a variety of issues. *See, e.g., Maloff v. City Commission on Human Rights*, 38 N.Y.2d 329, 332, 379 N.Y.S.2d 788, 790, 342 N.E.2d 563 (1975) (city agency had jurisdiction over

---

**6.** As in *Rosa R. v. Connelly*, 889 F.2d at 438 n. 2, the parties in this case failed to establish a record regarding funding percentages in more recent school years.

**7.** The New York Court of Appeals' reference to a board of education as an "agent[ ] of the State," *New York Civil Liberties Union v. State*, 4 N.Y.3d 175, 182, 791 N.Y.S.2d 507, 512, 824 N.E.2d 947 (2005), does not, by itself,

compel the conclusion that a board is entitled to Eleventh Amendment immunity. *See, e.g., Minton v. St. Bernard Parish Sch. Bd.*, 803 F.2d at 131 ("Although Louisiana courts have referred to school boards as 'agencies' of the state, this characterization does not amount to an assertion that the boards are arms of the state within the meaning of the eleventh amendment.").

board of education, despite fact that "it is well settled that the Board of Education of the City of New York is a state agency"); *Divisich v. Marshall,* 281 N.Y. 170, 173, 22 N.E.2d 327 (1939) (finding that city cannot control budget cuts planned by board of education, and stating that "[i]f there be one public policy well-established in this State it is that public education shall be beyond control by municipalities and politics.") The quoted language must, however, be read in the context of the particular issue raised.

In *Lanza,* members of the Board of Education of the City of New York raised a "home rule" challenge to state legislation terminating their terms of office and providing for a new method of appointment. *Id.* at 322–26, 229 N.Y.S.2d at 383–86, 183 N.E.2d 670. In rejecting this challenge, the New York Court of Appeals concluded that board members were not "city officers" within the meaning of Section 9 of Article IX of the State Constitution. *Id.* at 326, 229 N.Y.S.2d at 386, 183 N.E.2d 670. The court acknowledged that "members of a Board of Education in a city perform tasks generally regarded as connected with local government"; nevertheless, it observed that "they are officers of an independent corporation separate and distinct from the city, created by the State for the purpose of carrying out a purely State function and are not city officers within the compass of the Constitution's home rule provisions." *Id.* In short, the quoted language emphasizes that boards of education are corporate bodies distinct from the cities in which they operate. *See id.* (" 'The Board of Education of the City of New York is not a department of the city government, it is an independent corporate body.' ") (quoting *Matter of Divisich v. Marshall,* 281 N.Y. 170, 173, 22

N.E.2d 327 (1939)). Such corporate independence does not, however, preclude boards of education or school districts from themselves qualifying as municipal corporations, much less does it automatically equate boards of education to arms of the state for purposes of claiming sovereign immunity. As *Lanza* observed, many of the functions performed by boards of education are "generally regarded as connected with local government." *Id.*

Indeed, New York has long viewed the task of educating its schoolchildren as a shared state and local responsibility. In 1812, when the New York legislature established a statewide system of school districts, the residents of each district were charged with electing local trustees to operate the schools. *See Paynter v. State,* 100 N.Y.2d 434, 457, 765 N.Y.S.2d 819, 835, 797 N.E.2d 1225 (2003) (Smith, J., dissenting). For most of the Nineteenth Century, the state supported public schools through a statewide lottery (declared illegal in 1822), by establishing the Common School Fund and the Literature Fund, and by levying a modest statewide real property tax (between 1851 and 1901). *See* James D. Folts, *History of the University of the State of New York and the State Education Department, 1784–1996,* at 9–10 (1996). As school facilities expanded toward the end of the century, however, local taxes rather than state allocations came to be the primary means of financing public schools. *See id.* at 10, 765 N.Y.S.2d 819, 797 N.E.2d 1225.

The amendment of the New York State Constitution in 1894 to add Article XI— sometimes referred to as the Education Article—imposed upon the legislature the duty of providing a system of free common schools,[8] *see Reform Educ. Fin. Inequities*

---

8. The Article, originally identified as Article IX, but renumbered in 1939, states that "[t]he legislature shall provide for the maintenance and support of a system of free common

*Today v. Cuomo*, 86 N.Y.2d 279, 284, 631 N.Y.S.2d 551, 552, 655 N.E.2d 647 (1995), but a key premise underlying the Article was "that a system of local school districts exists and will continue to do so because the residents of such districts have the right to participate in the governance of their own schools," *Paynter v. State*, 100 N.Y.2d at 442, 765 N.Y.S.2d at 823–24, 797 N.E.2d 1225.[9] Such local governance is generally exercised through two corporate entities: (1) the local school district, which we have conclusively ruled is not an arm of New York State, *see Fay v. South Colonie Cent. Sch. Dist.*, 802 F.2d at 27–28; and (2) the district's board of education, which operates with considerable discretion in overseeing the day-to-day operation of the schools within its charge, *see, e.g., Acme Bus Corp. v. Bd. of Educ.*, 91 N.Y.2d 51, 55, 666 N.Y.S.2d 996, 998, 689 N.E.2d 890 (1997) (noting local board's discretion in selecting contractors); *Lloyd v. Grella*, 83 N.Y.2d 537, 547, 611 N.Y.S.2d 799, 803, 634 N.E.2d 171 (1994) (emphasizing local board's discretion over persons having access to school facilities); *Frasier v. Bd. of Educ.*, 71 N.Y.2d 763, 766, 530 N.Y.S.2d 79, 81, 525 N.E.2d 725 (1988) (noting local board's discretion in selecting probationary teachers and evaluating them for appointment).

In sum, it is undeniable that the state has historically played an active role in the education of children in New York. *See Campaign for Fiscal Equity, Inc. v. State*, 86 N.Y.2d 307, 317, 631 N.Y.S.2d 565, 570, 655 N.E.2d 661 (1995) (noting that Article XI requires state to provide "minimally

adequate" facilities to all public schools). It is likewise undeniable, however, that local boards of education have historically played a similarly active and frequently independent role. *See Campaign for Fiscal Equity, Inc. v. State*, 100 N.Y.2d at 929, 769 N.Y.S.2d at 128, 801 N.E.2d 326 (noting that "justification for a school funding system based on local taxation is the preservation and promotion of local control of education" (internal quotation marks omitted)). In light of this long history of shared state and local responsibility for public education, the Board fails convincingly to demonstrate that this fourth factor weighs in favor of treating local boards of education as arms of New York State, particularly when this court has already declined so to treat the local New York school districts administered by such boards. *See Fay v. South Colonie Cent. Sch. Dist.*, 802 F.2d at 27–28. Instead, we view the function factor as neutral for purposes of assessing the Board's Eleventh Amendment immunity.

### (e) *Whether the State Has Veto Power Over the Entity's Actions*

■■■ A local board of education does not equate to an arm of the state simply because it is subject to "some guidance" from state authorities. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. at 280, 97 S.Ct. 568 (rejecting local board of education's Eleventh Amendment immunity claim even though it was statutorily "subject to some guidance from the State Board of Education"); *see also Rosa R. v.*

schools, wherein all the children of this State may be educated." N.Y. Const. art. XI, § 1.

**9.** In *Paynter,* the Court of Appeals ruled that plaintiffs, who alleged that state policies and practices had resulted in high concentrations of racial minorities and poverty in the Rochester City School District, thereby leading to abysmal student performance, failed to state a

claim under Article XI. *See* 100 N.Y.2d at 438, 765 N.Y.S.2d at 821–22, 797 N.E.2d 1225. The Court reasoned that holding the state liable for the demographic composition of a school district risked subverting the important and long-established role that local communities play in public education. *See id.* at 442, 765 N.Y.S.2d at 823, 797 N.E.2d 1225.

*Connelly*, 889 F.2d at 437 (rejecting immunity claim of local board even though "the [Connecticut] state board of education is charged with general supervision and control of the educational interests of the state" (internal quotation marks omitted)). The fifth *Mancuso* factor looks for evidence of the state's authority actually to veto the decisions of local school boards.

The Board submits that such veto power is evidenced in this case by the supervisory authority of the New York State Commissioner of Education over all schools and boards of education in the state. *See* N.Y. Educ. Law §§ 305(2), 309. It notes that the Commissioner is statutorily authorized (1) to remove for cause any school officer, including a member of a board of education, and to withhold funds from a school district under certain circumstances, *see id.* § 306; (2) to review various official acts by a board of education or by school officials upon a petitioner's request, *see id.* § 310; and (3) to institute proceedings as necessary properly to enforce any law pertaining to the school system, *see id.* §§ 308, 310. While this power is undoubtedly broad, *see Board of Educ., Commack Union Free Sch. Dist. v. Ambach*, 70 N.Y.2d 501, 510, 522 N.Y.S.2d 831, 835, 517 N.E.2d 509 (1987), upon close inspection it does not unequivocally equate to veto authority, which implies the power to halt a decision, however lawful, for no reason other than disagreement with the choice made.

The Commissioner's authority to remove a local board of education member or to withhold state funds from a school district is not so broad. It may be exercised only when the member or district has demonstrated "wilful" disobedience of the law. *See* N.Y. Educ. Law §§ 306(1), 306(2), 1706; *see also Matter of McCall*, 34 N.Y. Ed. Dept. Rep. 484 [Decision No. 13,390] (1995) (noting that board member who acts

in good faith reliance on advice of counsel cannot be found to have requisite willfulness to warrant withholding of funds); *Appeal of Schofield*, 34 N.Y. Ed. Dept. Rep. 143 [Decision No. 13,263] (1994) (observing that board member must act intentionally and with wrongful purpose to warrant removal).

As for the Commissioner's authority to review the wide range of actions identified in New York Education Law § 310, this broad discretion concededly extends to lawful board decisions, but it cannot generally be exercised *sua sponte*, as would be the case with a veto. Rather, a third party must first challenge a particular board decision. *See* N.Y. Educ. Law § 310 ("Any party conceiving himself aggrieved may appeal by petition to the commissioner of education who is hereby authorized and required to examine and decide the same."); *see generally Board of Educ., Commack Union Free Sch. Dist. v. Ambach*, 70 N.Y.2d at 510, 522 N.Y.S.2d at 835, 517 N.E.2d 509 (noting that Commissioner's "broad review power exists so as to make all matters pertaining to the general school system of the state within the authority and control of the department of education and to remove the same so far as practicable and possible from controversies in the courts" (internal quotation marks omitted)); *Malverne Union Free Sch. Dist. v. Sobol*, 181 A.D.2d 371, 375, 586 N.Y.S.2d 673, 676 (3d Dep't 1992) (referencing Commissioner's "appellate jurisdiction over controversies within the common school system").

As the Board correctly notes, New York Education Law § 308 does empower the Commissioner himself to institute proceedings even absent a third-party request, but that authority exists as "necessary to properly enforce and give effect to" state law pertaining to the schools or to the rules or directions of the state board of regents.

The Board has failed to point us to any instance where the Commissioner has initiated a § 308 proceeding to exercise veto-like power over a *lawful* decision by a local board of education simply because the Commissioner disagreed with the choice made. Indeed, we have been able to locate only two reported cases involving the Commissioner's *sua sponte* exercise of § 308 authority, neither of which reflects such a peremptory veto. *See Pordum v. State*, 112 A.D.2d 717, 717, 492 N.Y.S.2d 204, 205 (4th Dep't 1985) (concluding that § 308 empowered Commissioner to direct local board of education not to reinstate teacher until his fitness to possess teaching certificate had been resolved at hearing), *aff'd*, 67 N.Y.2d 770, 500 N.Y.S.2d 506, 491 N.E.2d 679 (1986); *Board of Educ. v. Ambach*, 123 Misc.2d 622, 626, 474 N.Y.S.2d 244, 246–47 (Sup.Ct., Monroe Co., 1984) (concluding that, under § 308, Commissioner could direct local board of education to take certain actions to enforce School Asbestos Safety Act).

In sum, without minimizing the considerable supervisory authority conferred by New York law on the State Commissioner of Education, we conclude that the Board has not convincingly demonstrated that this authority equates to a veto power over the unprotested day-to-day decisions of local boards of education. We deem this factor neutral in determining whether the Board is an arm of the state for purposes of Eleventh Amendment immunity.

### (f) *Whether the Entity's Financial Obligations Are Binding on the State*

The final *Mancuso* factor asks whether the money judgments obtained against the defendant governmental entity are binding on the state. In considering this question with respect to the defendant Board, we begin with New York Education Law § 1709(8–c), which requires every local board of education to "establish and maintain a program of reserves ... to cover property loss and liability claims." The monies in this reserve fund must be kept separate and apart from other district funds and "shall not be reduced to amounts less than the total of the amounts estimated to be necessary to cover incurred but unsettled claims or suits." *Id.* The existence of this reserve fund suggests that any judgment against a local New York board of education would be paid out of its established fund rather than the state treasury, weighing against Eleventh Amendment immunity.

The Board does not dispute its ability to employ the reserve fund to satisfy any judgment in this case. Nor does it point us to any instance in which a judgment against a local board of education has, in fact, been paid directly from the state treasury. Instead, the Board submits that, because some money in the reserve fund may have been derived from state appropriations, a judgment against the Board is, in effect, a judgment against the state. The argument is unconvincing for several reasons.

First, its logic would presumably apply equally to judgments against New York school districts as well as to boards of education, and we have already concluded that such districts do not constitute arms of the state entitled to Eleventh Amendment immunity. *See Fay v. South Colonie Cent. Sch. Dist.*, 802 F.2d at 27 (holding that school district's receipt of state funds is insufficient to make it state's *alter ego*; record must show that payment of judgment "will come *directly* from the state treasury" (emphasis added)).

Second, with particular respect to local boards of education, the argument is at odds with the holdings of the Supreme Court in *Mt. Healthy City School District*

*Board of Education v. Doyle,* 429 U.S. at 280, 97 S.Ct. 568 (holding that local Ohio board of education's receipt of "a significant amount of money from the State" was insufficient to support its claim of Eleventh Amendment immunity), and this court in *Rosa R. v. Connelly,* 889 F.2d at 437–38 (rejecting immunity claim by local Connecticut board of education even though "local boards receive much of their financing from the state").

Finally, New York Education Law § 1709(26) makes plain that, if a local reserve fund proves insufficient to satisfy a judgment, further funds are to be obtained not from the state treasury but by the board of education levying a tax on property within the district.[10] Read together with § 1709(8–c), this statutory scheme confirms that the state treasury is not obligated to pay directly any judgment against the Board in this case. Accordingly, the final factor weighs against the Board's claim to be an arm of the state.

To summarize, even if two of the *Mancuso* factors—the function factor and the veto factor—are deemed neutral on the

Board's claim to be an arm of the State of New York, the remaining four factors convincingly weigh against according it that status.[11]

### (2) *The Underlying Purposes of the Eleventh Amendment*

Assuming that the neutrality of two *Mancuso* factors warrants proceeding to the next step of analysis, we conclude that neither of the underlying purposes of the Eleventh Amendment supports the Board's immunity claim. We can hardly conclude that there would be clear injury to the sovereign dignity of the State of New York by allowing local boards of education to be sued in federal court when we have rejected such a conclusion with respect to suits against the state's local school districts. *See Fay v. South Colonie Cent. Sch. Dist.,* 802 F.2d at 27–28. The fact that any judgment in plaintiff's favor would likely be paid from the local district reserve fund or from local property taxes levied by the board of education, not directly from the state treasury, also supports a final conclusion that the Board is

---

**10.** Although N.Y. Educ. Law § 1709(26) expressly references only judgments entered against "the district," the Board concedes that this law "authorizes boards of education to levy taxes in order to pay judgments" against themselves. Appellant Br. 20 n. 6. Accordingly, we have no reason to assume otherwise on this appeal. *See Norton v. Sam's Club,* 145 F.3d 114, 117 (2d Cir.1998) (noting that argument not raised on appeal is deemed waived).

**11.** To the extent the Board attempts to support its Eleventh Amendment immunity claim by pointing us to several unpublished decisions from district courts in this circuit holding that New York school *districts* possess Eleventh Amendment immunity, its reliance is misplaced. In *Scaglione v. Mamaroneck Union Free Sch. Dist.,* No. 01–1811 (S.D.N.Y. Feb. 22, 2002), *aff'd* 47 Fed.Appx. 17 (2d

Cir.2002), the district court simply assumed that New York school districts were immune from suit without acknowledging our contrary holding in *Fay v. South Colonie Central School District,* 802 F.2d at 27–28. Our summary affirmance in *Scaglione* has no precedential value, *see* 2d Cir. R. § 0.23, and certainly did not overrule *Fay.* In *Montes v. Washingtonville Cent. Sch. Dist.,* No. 03–8234 (S.D.N.Y. Mar. 19, 2004), the district court applied the test articulated by this court in *Mancuso* and concluded that New York school districts were arms of the state entitled to Eleventh Amendment immunity. This conclusion has been rejected by several other district courts in this circuit, *see Hanig v. Yorktown Cent. Sch. Dist.,* 384 F.Supp.2d 710, 717–18 (S.D.N.Y.2005); *Cohn v. New Paltz Cent. Sch. Dist.,* 363 F.Supp.2d 421, 426–27 (N.D.N.Y.2005), and, in any event, is contrary to our holding in *Fay.*

not appropriately viewed as an arm of the state for purposes of Eleventh Amendment immunity.

### III. *Conclusion*

To summarize:

(1) the defendant Board of Education bore the burden of demonstrating that it was an arm of the state entitled to dismissal of this action on the ground of Eleventh Amendment immunity;

(2) the Board's claimed status as an arm of the state entitled to Eleventh Amendment immunity is properly determined (a) by considering whether the six factors identified in *Mancuso v. New York State Thruway Auth.*, 86 F.3d at 293, all point in the same direction on that issue; and (b) if the *Mancuso* factors point in different directions, by considering whether suit against the governmental entity would do injury to the state by offending the Amendment's twin reasons for being, i.e., protecting the dignity and treasury of the state; and

(3) the Board failed under this standard to demonstrate that it is an arm of the State of New York entitled to claim Eleventh Amendment immunity.

Accordingly, the district court's order, entered on February 8, 2005, denying the Board of Education's motion for dismissal on the ground of Eleventh Amendment immunity is hereby AFFIRMED.